Ladies and gentlemen, our case for argument is University of Notre Dame v. Burwell, Mr. Karras. May it please the court, Hobby Lobby confirms that Notre Dame's religious belief controls, and it believes that the acts mandated by the accommodation connect it in a way that is sufficient to make it immoral. All that is left is the strict scrutiny analysis, and this court, in the court-paid decision... Well, before you go further, I have difficulty understanding what exactly you want the preliminary injunction to say. Well, we'd like the exemption, Your Honor. No, no, I want you to tell me what will the preliminary injunction you want, what would it say? It would enjoin the government from enforcing the mandate, the statute, and its regulations against Notre Dame. That is exactly what the exemption does. Well, wait, I'm lost. You invoke the exemption, you sent the message to Aetna, I'm including Maritain with Aetna, just for simplicity. You complied fully with the statute by doing that, and as a result, Aetna does not reimburse for contraception for Notre Dame staff or students. So, what do you want done about that? Do you want your exemption notice returned to you, or what? The self-certification that Notre Dame signed was not an exemption, Your Honor. We were not exempted from the statute, and in Hobby Lobby... I don't understand. The notice is an assertion of your right, and then you send it to Aetna, and Aetna says, yeah, that means we don't supply any contraception or reimbursement of contraception to students or staff. That notice removed Notre Dame from paying for the contraception. Notre Dame's religious exercise is something much different. No, wait. So, you don't want it back, I take it. You don't want to rescind your notification to Aetna. Well, with respect to the third-party administrator, we do, because that self-certification was the instrument by which the third-party administrator then was obligated to provide the services. Without the notification, as Justice Sotomayor noted... Why did you send a notification if you didn't want its terms to go into effect? Because Your Honor did not grant us a preliminary injunction, and under compulsion and the duress of law... I don't know, what was the compulsion? The compulsion was the requirement. It was money, right, wasn't it? No, the compulsion under the mandate and the accommodation is either, for insured organizations, if you don't send the certification, then you're paying for the contraception, in addition to maintaining a contractual relationship with it. So, sending it removed the paying, but it did not remove the complicity. It did not remove the contractual relationship with the insurer or the third-party administrator. Okay, so far as the preliminary injunction is concerned, it's not really addressed to the notification you sent, but to what you call the objectionable contractual relationship? Well, it would be both, right? The accommodation in sending the notice is an alternative mechanism of complying with the contraception mandate. If we were exempted, we would not have to send the notice because we would not have to comply with the mandate. But you sent the notice. Yes, we did. Voluntarily. No, under compulsion of law. No. Well, we would. But you claim that you're not required by law to do that, so you could have refused. We could have refused to send the notice to our insurer and then been forced to choose a greater sin over a lesser sin. Either way, there's a violation of religious beliefs. Well. Right. In Hobby Lobby, the court recognized that. Okay, wait a minute. We've cut Hobby Lobby. So on the second part of it, the objectionable contractual relationship, what do you want the preliminary injunction to say about that? It would not have to speak to that at all. If we were exempted from the mandate, we would be free to enter into any contractual relationship we wish to. Well, wait a second. You have a contract with Aetna, don't you? We do. Are you saying you want us to issue an order which would allow you to break that contract? Well, with respect to the fully insured plan, if we are subject to the mandate, we have to contract with an insurance company, right? The mandate requires either you contract with an insurer or you don't offer insurance and then you're fined. And Hobby Lobby already determined that imposing those fines is a substantial coercion to violate religious beliefs. So if we had an exemption, we would be able to, just like churches do, churches are free to… Yeah, but of course you're not a church. Look, I don't think you're answering my question. Are you suggesting that the preliminary injunction would authorize you to break your contract with Aetna? No, if we were free from the mandate, we would be free to contract with Aetna to provide services in accordance with our religious beliefs. We could maintain a relationship with Aetna in which those services would not be provided pursuant to that contract, just like churches. So when you say objectionable contractual relationship, you're not considering breaking with Aetna, but just what? Aetna isn't reimbursing contraception. So what is it in addition you want to what you have? How would your contract with Aetna be modified if we issued this preliminary injunction you want? If we were exempt from the mandate, that contract would not involve the provision of objectionable services to our students or employees. Okay, so you want to revise the contract so that Aetna does not provide contraception reimbursement to students, right? No, the contract would not need to be revised. I don't understand. Aetna is providing this reimbursement to your students. Now you want Aetna not to do that. You want the preliminary injunction to forbid Aetna to do that. Isn't that a modification of your contract with Aetna? No, it is not. Is it not pursuant to contract that Aetna is paying for contraception? It is because of that contractual relationship. Yes, so don't you want to modify your contractual relationship with Aetna? No. But under the contract it's paying for contraception. No, under the mandate it's paying for contraception. No, it has a contract. It has to have a contract. Now take Maritain for example, Notre Dame's third party administrator. Let's get into Maritain. Aetna has a contract to provide this stuff, doesn't it? This reimbursement? It's not contractual? There is not a contract between Aetna and Notre Dame in which Aetna says to Notre Dame in that contract, we are going to provide objectionable services to your students. That's not in the contract. The contract is a contract for insurance and with respect to the students, it's a relationship between the students and Aetna that Notre Dame makes available to the students. For Maritain, it is a contract for... Is the contract with Aetna in the record? No, it is not. Do you know the terms of the contract? Do you know the duration of the contract? No, I don't. You don't know anything about the contract? The duration of the contract... I don't know anything about provision of contraception. It is not in the contract with Maritain at all to administer... I'm not talking about Maritain, I'm talking about Aetna. But Maritain is the contract that governs Notre Dame's employees. There is not a contract with Aetna for Notre Dame's employee plan. And the contract with Maritain... But Notre Dame has a contract with Aetna, doesn't it? Notre Dame makes a... Does Notre Dame have a contract with Aetna? Answer yes or no. They have a contract with Aetna to enter into a contractual relationship between the students and the insurer. That is, with respect to the student plans, Notre Dame makes available the insurance to the students. With respect to the employees, Notre Dame offers the insurance. So Notre Dame has a contract with Maritain to administer insurance that it offers. With respect to the student plan, it is simply making available to the students an insurance relationship between the student and the insurer. Mr. Karras, how is the relief you are seeking different from an injunction against Aetna and Maritain to prohibit them from reimbursing students and employees for contraceptive discovery? It's different because we're not asking for that. We don't need an injunction against Maritain. Again, the accommodation under which Maritain operates is an alternative mechanism for applying with the mandate. If Notre Dame was exempt from the mandate, it wouldn't need to comply with it. Maritain is administering claims that Notre Dame self-insures. So there would be no need to enjoin Maritain, to tell Maritain what to do, because the entire relationship with the third-party administrators  If Notre Dame was removed from that, it would be in compliance. Is there any practical difference between an injunction that would block Aetna and Maritain from providing that coverage and what you're asking for? Again, I'm not sure I understand the question, Your Honor. If Notre Dame was exempt, there would be no basis for which Maritain could provide the objectionable services. There would be no injunction necessary. I understood you to be arguing, Mr. Karras, that in essence you want to be put in the same position that Wheaton College is in right now. Is that right? That's not right. Okay. Perhaps I misunderstood your brief. Well, in some respects, the Wheaton College order and Wheaton did not advance this issue of maintaining a contractual relationship. The Wheaton decision made Wheaton College exempt. So we would like to be in a similar position as Wheaton was at that time that Supreme Court order was issued, which is the effect was Wheaton set a notice to the government to which it did not have a religious objection, and as a result, Wheaton became exempt. Here, we also wish to be exempt, but for us to send the same notice that the government has made as part of its revised accommodation would not involve the same situation as what happened in Wheaton. Granting an injunction here, therefore, would leave Notre Dame in the same position as the nonprofit plaintiffs who received injunctive relief from the Supreme Court in Wheaton College and Little Sisters of the Poor versus Sibelius. That was your Rule 54 statement. Exactly, because, again, at the time that the Wheaton injunction was issued, the notice that it sent to HHS made it exempt. The revised accommodation that the government suggests is like the Wheaton order would not do that. I don't understand the difference. Wheaton College is telling this court in a separate case that it's very unhappy with the status quo because it has sent notice to the government, and as I understand it, its students or its employees are covered under the two-step accommodation process. So you don't want that. No, we do not want to be covered under the two-step accommodation process. I don't know what's happening with Wheaton now, but at the time that injunction was issued, essentially the Supreme Court called the government's bluff in saying, okay, if Wheaton sends that notice, will you have the authority to reach out to the third-party administrator under ERISA and compel them to offer the services? And we certainly believe that the government did not. Under this new revised accommodation, the government's taking the position that it can do that, and it may very well have done that with Wheaton. The Wheaton order said, nothing in this order precludes the government from relying on this notice to the extent it considers it necessary to facilitate the provision of full contraceptive coverage under the Act. That's what's happened, as I understand it. And so I guess I'm a little confused about your position. Well, we've always taken the position that nothing prevents the government from offering the full range of contraceptive services to Notre Dame students and employees. And could it hire ETHNAS to be its intermediary? You know, the government doesn't usually reimburse people directly for their medical expenses. It works through health companies. So could they hire ETHNA and say, you'll be our intermediary to provide this contraception coverage? That would actually be the natural thing for the government to do, since ETHNA already has relations with Notre Dame and its students. We don't have a problem with the government using third parties to carry out... Including ETHNA. If it chose ETHNA to provide it across the country to everybody? I don't know what you mean by across the country. That doesn't make any sense. Government would say, ETHNA has been dealing for many years with Notre Dame, and for, you know, a year or so, it's been providing this contraceptive coverage to students who want it. And so the most efficient way to provide government reimbursement is via ETHNA at Notre Dame. Is that okay? Would that be proper? The way I understand Your Honor's hypothetical, I think the answer is no, because Notre Dame has a religious objection to maintaining a contractual relationship. You just said that the government can supply contraceptives to your students and staff. The government can do that, but the government, as you admit, operates through intermediaries. Now, ETHNA would be the natural intermediary for Notre Dame because of its previous experience. So why would it be improper for the government to hire ETHNA to be the intermediary, making clear to everybody that this was government money, this was not Notre Dame, it was not Notre Dame paying insurance premiums for this? Again, the answer is because Notre Dame would have a continuing relationship with ETHNA. But so what? ETHNA's status would have changed from a party contracting with the university to provide contraception to an intermediary between the government and Notre Dame. If Notre Dame was free to instead then engage in a contractual relationship with someone else, that might solve the problem. What's the problem? I don't understand the problem. The government gets to choose its intermediaries, certainly. Why wouldn't it choose the intermediary that had the most familiarity with Notre Dame? It may want to choose that, but if it creates a religious burden... Why does it create a religious burden if instead of ETHNA it's any other health insurance company? I think Judge Robner put this best in the hypothetical she posed to me. If you were a Jewish school that believed in offering lunch to your students and entered into a contract with a kosher vendor, and then the government passed a law that said kosher vendors must offer pork... Come on, that's a ridiculous example. Because ETHNA does not have any belief in anything except writing insurance and making money. And neither would the lunch vendor. They're not identified with Catholicism or with atheism or Judaism or anything of that sort. It's simply they are an insurance company which happens to have a lot of familiarity with Notre Dame. And it just seems you admit the government can use intermediaries to supply contraceptive services to the students at Notre Dame. I don't understand why you balk at the use of ETHNA for that purpose rather than some other health insurance company. I'm not suggesting ETHNA has a religious belief one way or the other. But if the government requires ETHNA to offer objectionable services and then requires Notre Dame to contract with ETHNA... Why would it require Notre Dame to contract with ETHNA? If Notre Dame does not offer insurance by contracting with ETHNA, it is fine. So it has to enter into the insurance market. And when the government says every insurer then has to provide those services, there is no choice. You're misunderstanding your own announcements. So what Notre Dame tells its students, and I assume its staff, says the University of Notre Dame honors the moral teachings of the Catholic Church. Therefore, for example, university health services may prescribe contraceptive medications to treat approved medical conditions but not to prevent pregnancy. To comply with federal law, ETHNA student health provides coverage for additional women's health products or procedures that the university objects to based on its religious belief. This coverage is separate from Notre Dame. Students enrolled in ETHNA student health may call ETHNA customer service at 877-378-9492 for more information. Students not covered by ETHNA student health should check with their own insurance plans regarding federally mandated women's health coverage. In other words, this ad or whatever it is or announcement to the students, this has removed Notre Dame from the provision of contraceptive services. They go from ETHNA to the students. And the students call up ETHNA and say, you know, I want a reimbursement or something like that. Notre Dame is completely out of it. So I don't understand if the government now came in and said, okay, ETHNA, you continue to provide this stuff and we reimburse you. What's the problem? I don't know what this has to do with religion. That's exactly what the plaintiffs in Hobby Lobby said is that the acts are ultimately in the hands of third parties and Hobby Lobby, you are washed from the problem. Hobby Lobby notified its, you know, insurance providers and they now deal directly with its employees. Just like, it's just what Notre Dame did. Notre Dame advised its students that they were compelled under the law to have these services provided and they stated what the law said. And they stated it along with a statement that said, we believe this causes us to violate our religious beliefs and these services may cease if we prevail in our litigation. Notre Dame has made its decision. But what's the violation if the government goes, if the money goes from government to ETHNA, which as you say has no religion, money goes from government to ETHNA, from ETHNA to students. It doesn't pass through anything to do with Notre Dame. Notre Dame is in a contractual relationship with ETHNA. Why is it in a, it doesn't have to be in a contractual relationship with it. This statement makes clear you the student can have your relationship with ETHNA. You don't have to have Notre Dame a party to anything. You absolutely do, your honor. No. And you certainly do with respect to... What requires Notre Dame to have a contract with any insurance company? Well, with respect to its self-funded plan, it absolutely has to have it. And the regulation itself requires Notre Dame to have a third party administrator. The accommodation doesn't work without a third party administrator and it has to be part of that contractual relationship and the government will tell you that if there is no notification sent out. Well, this is for the students. Right, I'm speaking with respect to the employee plan. Yeah, but what about the students? Well... The students are not, the students... Are you suggesting... According to Notre Dame, the students deal directly with ETHNA and ETHNA deals with the government. Notre Dame is not in the picture. Notre Dame negotiates and comes to agreements with ETHNA. It doesn't have to. It doesn't have to. Mr. Harris, can I ask you a couple of other questions? I know your time's up. We've obviously been keeping you busy. With respect to... I was wondering if you'd want to comment on the D.C. Circuit's point that's also been addressed some, I think, by the Supreme Court about the extent of the government's interest in what I think has been called seamless access. That is, based on empirical work indicating that access to contraceptive-related services drops off if women need to make separate different arrangements for that coverage. Right. Interestingly, this whole notion of seamlessness as a compelling interest never existed in this litigation until that decision from the D.C. Circuit. The government never advanced that. But to the extent it does now, and it certainly is now, there's nothing that is cited to for that proposition. What Your Honor referred to is a page in the Institute of Medicine report, which is not even in the record in this case, that talked about cost as a barrier with respect to mammograms, not contraceptives. One page in the IOM report. The word seamless appears nowhere in the IOM report. And there is nothing... I think the important point to me is there is nothing less seamless about Notre Dame's employees getting a separate contraceptive card from the government than it is from getting it from the third-party administrator. That actually brings up the second thing that I wanted to raise with you. The proceedings in the district court here were almost a year and a half ago, right? And obviously, both factually and legally, what we're dealing with here has been something of a moving target. And one of the things that I'm wondering about would be the value of returning this case to the district court for development of a fresh evidentiary record to deal with those changes in government policies and with the understanding of the law that has evolved over the last year and a half. What would be your thoughts about that? Well, when we came to you before, we did suggest at that time that we thought it would be appropriate to develop additional facts in the record with respect to the district court. The regulations have changed. The religious exercise that Notre Dame has articulated of not wanting to be in a contract with someone who provides or not wanting to file the forms, that hasn't changed at all. So I agree there may be additional facts and perhaps the government would attempt to try to introduce evidence on seamlessness, although I think the Corte decision precludes that. But I don't disagree. Why would Corte preclude that? Well, Corte is still good law in this circuit, and Corte determined that with respect to offering free contraceptives, seamlessness or non-seamlessness aside, that the government had not advanced a compelling interest and that there were clearly less restrictive means available, whether through the exchanges or Title X or other ways. And that's the area where I think we've gotten, or at least we've had additional information. I don't know how definitive it is from the Supreme Court about how one might evaluate alternatives under the RFRA standard. That leads me to think that perhaps that might be the most prudent approach at this point. But I would add that to the extent we went back to the district court to build additional evidence on this, what we've asked for is a preliminary injunction while all of that is determined, and that preliminary injunction is based on the record as it exists. The government hasn't offered anything on compelling interest or at least restrictive means or strict scrutiny at all. And so I think on the record that we have before us, we're at least entitled to a preliminary injunction, and then we can go back to the district court and try to work things out on the merits of this additional record. Mr. Karas, Notre Dame has, as you say, been required to give notes. So as we sit here and stand here today, are they compelled to do any more notice? Well, every day they have to be in a contractual relationship that violates the religious exercise. I meant on notifying the government of their position. No, there is not a monthly notice or there's not a new notice coming out that... Well, and following up on Judge Hamilton's inquiry, let's assume for a second that there was a recognition of substantial burden here. Unless restrictive, that's kind of a fact-intensive inquiry, isn't it? Well, it's a fact-intensive inquiry for the government to prove. Yeah, and but... But it's not a fact-intensive to say, you know, as the Quartet Court recognized or as the Supreme Court recognized when viewing the accommodation for the Hobby Lobby plaintiff who didn't object to that. You don't need much evidence to say, we've got Title IX, or I'm sorry, we have Title X, we have exchanges, students can pull up their iPhone and plug in healthcare.gov. That's not... There is no compelling interest that would trump the highest constitutional test we have. Those are least restrictive means. I think that we can do that by observation. Yeah, you think this court can determine least restrictive? I think that this court can determine that there are alternatives that are less restrictive. Well, let's assume that in a global sense that's true, but in a fact-finding sense, the phrase least restrictive speaks to, I guess, eventually one or two options. And I'm asking, do you think that's in the province of the appellate court as opposed to a trial court? Well, the Hobby Lobby court only had to identify one, right? It said clearly imposing this obligation on for-profit organizations is not the least restrictive means because we can identify one other one, and that was the accommodation in that case, which was fine for those plaintiffs. So I don't think you have to run the gamut. The government does. They have to disprove each and every one of them. But this court only has to find one. It doesn't matter that we have really two systems at work here, the self-insured situation with the university and the relationship with Aetna. No, no, not at all. You know, as the Hobby Lobby court noted in footnote 33, the whole fact that there was a church exemption proved that there must be a burden, right? If the accommodation is an exemption and we get to opt out, then why do we have the exemption that the churches have? Clearly, and that's what the court pointed to. It said the government's hard-pressed to say that what is going on here is not a burden because you have the exemption. And so why give it to some but not give it to others? I'm acknowledging that burden language and the burden point. I'm just suggesting that if an appellate court were to find a burden on the issue of least restrictive, you say the Supreme Court has given license to an inferior appellate court to find that there are least restrictive without having to specify which one or have a fact-finding inquiry? No, because it's the government's burden. So has the government... That's what it is, is has the government proved that there is no less restrictive means? If they have not, then they fail the strict scrutiny test. It's the government's burden who has put in no evidence. There is no record. There is no administrative record. There is no Institute of Medicine report. There is nothing that says the word seamless. So your position is that a preliminary should be in place until such a finding is had? Absolutely. So then that would still speak to a return to the trial court? Well, I think we're here on a preliminary injunction. There ultimately has to be a merits decision. Let me ask you, you say that this notion of complicity and mortal sin is Catholic doctrine? Yes. And where does that come from? Well, you want citation to the catechism for me to prove to Your Honor that what Notre Dame is doing is in sin? I just don't think that's what the courts are here to do. No, I don't want catechism. I want to know where that doctrine originates. Is this a Vatican doctrine? Is it a Notre Dame doctrine? Or what? Well, it's Catholic doctrine, Your Honor. Is it Catholic doctrine? A number of Catholic universities and colleges like Georgetown and DePaul and Boston College signed the form and left it at that. They're not bothered by what you're bothered by. So I'm just wondering what the source of your conception of Catholic doctrine is. The source of Notre Dame's articulation of its religious belief is its mouth. Excuse me? Its mouth. And it is saying to this court... I'm sorry, I didn't hear you. Its what? Its mouth. It has made a statement through affidavits to Your Honor. Yes, I know, but Roman Catholicism is a hierarchical church and the individual religious organizations do not get, as I understand it, to adopt their own doctrine. So when you referred to Catholic doctrine, I assumed you meant Vatican doctrine, rather than some private belief of Notre Dame officials. Right. There is Catholic doctrine in the catechism that discusses scandal and discusses the concepts of complicity. Yes, all right. So what should I make of this statement by Reverend Jenkins, the president of Notre Dame? Complicity, by signing the exemption form, is not an evil so great that we would compromise our conscience by going along with the accommodation. I don't see this as a scandal, which is a technical Catholic term for complicity in sin, because we are not giving out contraceptives. Now that's a religious view which is contrary to what you're arguing. It is not, Your Honor. It is not at all. Well, you used the term scandal, which is a technical Catholic term. He's saying not a scandal. Yes, in that same blog that Your Honor is referencing, that apparently is a report of Father Jenkins' statements, at a meeting to discuss civil disobedience and flouting the power of this court and the law. Father Jenkins also said, we're complying under protest. We feel this is an infringement on religious freedom, but we have a variety of factors to consider, like legitimate government authority. And the catechism does speak to compulsion and how circumstances can change under duress in the context of scandal. But I think the fact that the government was successful in coercing Notre Dame to violate its religious beliefs doesn't make the fact that they are honoring the law in society as evidence that they never believed it in the first place. So Georgetown and these other schools, what is their status under Catholic? I don't represent Georgetown. I know that every Catholic is ultimately called to make his or her own decision as to what constitutes a violation of their beliefs or not. And Notre Dame has come to that decision, as have obviously multiple bishops, dioceses, schools, congregations of nuns, health care systems, and publishers who have made the exact same moral decision. What Georgetown does or doesn't do, I can't speak to. Now in your student guide, your open enrollment decision guide for 2014, it mentions the Maritain's contraception coverage. And there's no under-protest language. It just looks like an ad. Now your students have another option. Now you have Maritain's contraception coverage. Why isn't there any suggestion that this is not the desirable service? Well, that language that Your Honor is speaking to is taken directly from the Code of Federal Regulations as a notice that is supposed to go to employees and students. And Notre Dame obviously feels an obligation to answer questions, to do what it needs to do rather than to ignore it. But it didn't say we're required by the government to do that. Yes, Notre Dame issued a release publicly that was published in the Observer. Yes, but it's not in this guide that goes to the students. Because they couldn't have made it clearer all that. It also said, the guide says that Maritain would provide contraceptive services as long as you were enrolled in the university's medical plans. Now, wouldn't it be a breach of contract if you were to terminate those services for students who were still enrolled? No, it would not. Again, Your Honor, because that language, as long as you're enrolled in the plan, comes from 26 CFR 549815-2713AT. So does that mean you are bound to continue to provide that contraceptive coverage to those students? No, because again, Notre Dame at the time that it sent the self-certification and started offering these under duress, it made a statement to every student and every employee and printed it in the Observer and issued it to WNDU and all of the news services that says we are litigating this issue, it violates our beliefs, and if we win, it will stop. So there is no, if Your Honor is trying to bring up kind of a detrimental reliance contract issue, the issue of this litigation and Notre Dame's belief that it wanted to stop this and that it would stop this if the courts recognized its religious beliefs that that would cease. Okay. Okay, well, thank you very much, Mr. Karras, and we'll hear from Mr. Stern. Thank you. May it please the court? I'd like to take any questions that the court has. We've already obviously had argument once, and we've submitted our statements, and sort of our, what we have to add to what we've said before is pretty brief. Sort of just with respect in particular to the issues that the court raised this afternoon in terms, I mean, this court previously held that there was not a substantial burden, admittedly, in an interlocutory posture, but that was the holding of the court. Could you speak louder? I'm sorry, Your Honor. Is that better? The court previously held that there was no substantial burden. Hobby Lobby gives, we think, no reason whatsoever for the court to conclude that that was error. And I won't go through, except to the extent that the court has questions, I won't go through all the reasons why we think that's so. The court asked questions about what a preliminary injunction would do at this stage, and Mr. Parris answered correctly that there is no further notice that Notre Dame is required to provide, so that at this stage, while I understand that Notre Dame is complaining about an ongoing association with its insurer, in terms of the notice that it is providing, the notice has already been provided, and even in the Supreme Court's injunction in the Wheaton case, on which plaintiffs place some reliance, the Supreme Court made clear that the government in that case could use the information in order to effectuate the accommodation, and so at a minimum, that would continue in place, even if there were an injunction, and we don't see any basis for issuing one. Obviously, with respect to the question of whether there is a compelling interest slash least restrictive means, it's in court's discretion whether to ask the district court to address that in the first instance. We disagree. I think that that is a fact-intensive inquiry, and the Supreme Court, it's true, specifically did not pass on the question of whether the accommodation was the least restrictive means, made quite clear that it was a less restrictive means, and the government's administrative record is very much the whole history of how this accommodation developed. You know, there have been many iterations of it, but taken all together from the start of the promulgation of the relevant sort of requirements, the first round of the accommodation and the second round, what the agencies have always made clear is what they've been striving to do is to achieve the balance of getting seamless coverage for women with trying to the greatest extent possible to respect the religious convictions of nonprofit organizations, and that is what the entire record really is all about. It's not the case that this is a foreign concept that's suddenly been injected. We couldn't argue the point the last time we were here because of the Corte decision. We do think that Hobby Lobby allows this court to now consider, as the D.C. Circuit did, even though it also had a prior decision in the for-profit cases in Jilardi, the D.C. Circuit recognized that it could consider the least restrictive means compelling interest question, and we think that this court can do the same, and I think, excuse me, I think that what's notable is that it's very, that plaintiff at no point has made clear or even vaguely clear what kind of an alternative it would regard as being meaningfully less restrictive than the accommodation and the amended accommodation. I thought they were pretty clear that Title 10, a new, direct, federally funded program that women would have to sign up for. Right, perhaps Your Honor is right, and I misspoke. I think that unless you had a, I think unless you had a sort of universal coverage, essentially the federal government became sort of established a single-payer system across the country for contraceptive coverage. I think in some form, whatever, wherever, whatever law that was attached to, and I think that's what Mr. Karas was saying in response to the court's questions, is if there were that kind of single-payer system so that there was no sort of opt-out of any kind, it just was going to apply to everybody equally. I think that is the only alternative that plaintiffs would find acceptable, and we don't think that the government is required to do that under a least restrictive means compelling interest inquiry. What the government is doing is it is already arranging for separate payment. It is coming in. It is making the payments. In effect, it's contracted separately with Aetna to provide the coverage. Every sort of I's been dotted and T's been crossed in order to try and make it clear to everybody in the world that Notre Dame has no involvement in this, and the whole point is that, I think as this court recognized in its prior decision, this is sort of a question of Aetna having to just, all it has to do is to raise its hand and say, I don't want to provide it. Everything else is done. We think that that's the, not only a less restrictive, we think in every meaningful sense, that's got to be the least restrictive and anything else is going to impinge on the rights of the students, the employees, and their dependents, and the Supreme Court reiterated both the majority and Justice Kennedy in Hobby Lobby, that the court has to also take into account the impact on third parties, so we don't think that to the extent that the court is going to consider the question of compelling interest, least restrictive means, obviously could remit. We don't think that it needs to. Mr. Stern, I'm going to ask you the question that I keep asking myself, and that is, why are we here today? So I want you to, if you can, help me on what we ought to focus on in the GVR. Is it that we should revisit substantial burden? Is it the least restrictive, perhaps not compelling interest? I'm not sure, because of course, that's sometimes the dilemma of the GVR. But I'm sure you're a highly experienced and able counsel for the Justice Department. You must have thought about what it is they're asking the high court, because it would help me if you would share with me your assessment of what ought to be either revisited or refocused in some fashion. Your Honor, I don't think I'm going to be able to be very helpful, because my own sense is just that the GVR is not a very high standard, that Hobby Lobby was, like, even though we thought that the GVR was in effect... I don't mean to interrupt you, but what teaching of Hobby Lobby would you suggest we ought to examine that we did not, if that's the case, when they say in light of, in theory, someone's shining light for an inferior court to reflect on. So it just seems to me we need to answer the high court in some fashion, maybe with the same answer that was given by the majority before, but is substantial interest not to be revisited? Substantial burden, excuse me. I think that the GVR leaves it for this court. Certainly this court needs to look at all aspects of its opinion. I mean, its prior opinion was vacated, and I think Hobby Lobby speaks in various ways to both substantial burden and to compelling interest, and this court didn't previously reach compelling interest. Let's just start with substantial burden. Tell me how we can parse the burden in Hobby Lobby apart from the burden here, just on the question of substantial burden. I think that the entire thrust, I mean, I think that Hobby Lobby turned on the fact that there was no opt-out, and the court doesn't make a hundred percent, because obviously it wasn't deciding this case and was making it very clear. It wasn't deciding the next round of cases, which it was fully aware, but I do think that the court's reasoning was you either provide this coverage or you face the financial penalties, and we think that that doesn't suggest that if you raise your hand to go, I'm opting out. So with Notre Dame having the opt-out or check-the-box option, that immediately makes, in your view, the department's view, the government's view, a lesser substantial burden for Notre Dame. It certainly has to be a lesser burden than was the case in Hobby Lobby. I mean, whether or not it's substantial, it's got to be lesser. I mean, so, and then I do think that the court's entire discussion about, I mean, the court really seized on the existence of the accommodation as the structure on which it built its decision by saying, well, you've demonstrated that there is a less restrictive. So what about the parties? Should we focus on a Christian-owned corporation in a light different than a leading Catholic institution that higher education, or should they be the same? I mean, I'm not sure that I understand the question. Well, I'm just, I'm trying to draw the parallels and tease out the teachings of Hobby Lobby that we are asked to rethink or think again on our case. And I'm just seeking help. Listen, I'm asking these questions respectfully. Right, no, I totally understand that and I appreciate it, Your Honor. I mean, I think that Hobby Lobby made clear that certain arguments were not available to the government. After all, we lost to Hobby Lobby. So even though we think that its teachings sort of strengthen our position here, certain arguments were taken off the table. And so to the extent that the court may have thought that courts of appeals pre-Hobby Lobby were relying on any of that kind of reasoning, that's gone. The court looked at... Well, what's puzzling, I think, is that Hobby Lobby seems like a much easier case, right? Hobby Lobby objects to these, you know, morning after pills and IUDs, but it has no objection to notifying its insurers that they're not to reimburse, you know, its employees' morning after pills, right? I'm not sure... So I don't see what there is in Hobby Lobby that actually relates to our case. I do think that its analysis of the purposes that are being served and the fact that this is certainly a less restrictive means, even though the court didn't pass on whether it was a least restrictive means, are relevant. And the court, again, repeats, you know, as we've noted in our statement, we tried to point out a number of the times that the Supreme Court says that and seems to take seriously the idea that the effect on the provision of contraceptive coverage to women will be, in the court's words, precisely zero and, on the other hand, in terms of burden, that the institutions, eligible institutions, are, quote, effectively exempt. And we think that those teachings are relevant. I mean, this was, after all, a divided court. But how would anything in Hobby Lobby affect the analysis, say, in our first opinion? I ultimately think that it confirms... Yeah, but then they wouldn't have granted, they wouldn't have sent it back to us. I come back to... They must have thought that there was something in our analysis that was deficient. I can't figure out what it is. I guess I just sort of disagree to the extent that I don't think... I think that GVR is a relatively low standard. We didn't think, obviously, that it should have been granted in Notre Dame. You know, we opposed the GVR. But we also think that sort of sending it back to go, look, we've issued a relevant decision is not something extraordinary and doesn't necessarily reflect a view on the merits. And we do think that it does, the decision does provide some instruction that we think is helpful to the position that we asserted. With the option that the high court has to grant certain, the other district, other circuit court cases, do you think it's fair to read into it that they want a more developed record in our case? On the question of least restrictive. I mean, I think that certainly to the extent that the court would want to be looking at a decision, I would hope, that addressed the least restrictive compelling interest question. Because we do think that if for any reason the Supreme Court were to disagree with the substantial burden, we certainly would hope that it would go on to the rest of the analysis. You know, we think that Hobby Lobby, you know, was helpful to us on both counts. But obviously, you know, they were not faced with a circuit split, that's for sure. No, and we don't have a circuit split. And we do know that, you know. So, I mean, they weren't looking for us to percolate in what one would normally think would be the case where they delay for a while to see the law evolve. They had four circuits that addressed the issue generally. So, that's what's perplexing to me. I understand, Your Honor. I mean, again, we didn't think that it was appropriate. No, no, I understand the opposition. But we also don't think that it reflects like a precise view. So, you don't see a singular theme that comes from Hobby Lobby or a teaching that would cause us to revisit? No, I think it provides a framework that's consistent. I mean, I think that... They want us just to say what we said before? I think that saying what you said before is like very much like an option, like with the GBR, but the court doesn't expect that the court is going to change its position in light of that. And I really... That, I think, is sort of consistent with practice over time. Okay, thank you, Mr. Stern. Ms. Kahn? Good afternoon, and may it please the Court. I wanted to follow up on something Mr. Karras said, which is that Priests for Life was the first introduction of the notion of the importance of seamless access to contraception. And I want to read from the Federal Register, which accompanied the enactment of the first accommodation. And it says this, and this is just one of three places that I, on a very quick review over there, was able to find mention of this. And I'm quoting from volume 78, page 39888. And it says... ...and to sign up for a new health benefit would make that coverage accessible to fewer women. The same concern undermines the effectiveness of other commenters' suggestion that the government require the multi-state plans on the exchanges to offer a standalone contraceptive-only benefit to all women without charge. And that theme, as Mr. Stern mentioned, does arise throughout the Federal Register. And so I think that the importance of seamless access to coverage really can't be overstated. And the underlying compelling interest, too, can't be overstated. You know, I listened to this conversation, and frankly, it's a little bit academic. I mean, what's getting lost here is that there are 6.6 million pregnancies unintended annually in this country. 40% of them lead to abortion. And the others who carry those over 2 million births, unintended pregnancies that lead to live births, create a host of risks, both for women and for babies. And that compelling interest, I think, the magnitude of that truly can't be overstated. And the government has bent over backwards to allow accommodations, now a second accommodation since the time we last were here, so that entities like Notre Dame can step aside from providing that coverage themselves. Now, you've already discussed the mechanics of the accommodation, and so I'm not going to belabor the point, other than to say that I want to freeze the moment in time when a nonprofit registers its objection through either of the accommodations that the government has provided. At that moment in time, the U.S. could have decided, that's it, end game, no contraception is going to be available. What it did instead, by enacting a separate regulation, is to require someone else to pick up the ball. And that stands in sharp contrast to what was the case in Hobby Lobby, which is the entities themselves were required to provide the coverage. And as Your Honor pointed out today, even Notre Dame has acknowledged on its website that that coverage is provided separately from the university. And I agree with Mr. Stern that Hobby Lobby sheds a great deal of light on how one might look at the compelling interest and the least restrictive requirement alternatives of the Religious Freedom Restoration Act. But I want to take a little time to just talk about how even if there is a substantial burden on Notre Dame, even if there is no compelling interest or the least restrictive alternative was not employed, there are other factors that one needs to look at in deciding whether a preliminary injunction ought to issue. And the most important of those are balancing the irreparable harms here, both to the university and to the women and to the public. And here what we have is a situation where Notre Dame has already complied with this accommodation. You can't unring a bell. The United States has the information it needs to provide this contraception. And in that sense, as an aside, this is really like Bowen, Bowen v. Roy, which was the circumstance where a Native American objected to both the provision and the use of a social security number. And eight of the nine justices on the Supreme Court said, the government already has it. So at this point, the government just has to run with it. And that's the circumstance we have here. So Notre Dame is really in a very different circumstance in terms of the equities than any other entity we've talked about here, any one of the other cases, any other of the non-profits. And by the same token, in contrast, I see that my time is up. In contrast, we have women here who have access in this coverage, employees and students. And what's the irreparable harm to them? It's not just the lack of contraception in an academic sense. It's the fact that some of these women are going to get pregnant. And they're going to have unintended pregnancies, and they're going to have to face what comes from that. And in my opinion, it's not even comparable in terms of the magnitude on one side and the other. Does that not speak to what the preliminary injunction would be? Are you saying any preliminary injunction would foreclose access to all these services? Well, the preliminary injunction that Notre Dame is asking for is one that would disallow Aetna from providing the coverage, or one that would allow them to terminate their contract with Aetna insofar as it persists in offering the coverage. So in the end... Well, is that the only way to accommodate their religious objection with regard to a preliminary injunction? Is it not a possibility that injunction can be tailored to honor what they consider their facilitation or being a conduit and still recognize that on the ground the realities that you speak of are not affected? You, Your Honor, would have to ask Mr. Karasat. My understanding is the answer is no. There is no injunction short of enabling Notre Dame to contract with an entity that would not offer the contraceptive benefits to its students and employees outside the context of the government enacting a whole new program that somehow doesn't use their insurance company but instead creates a whole new scheme by which women who are either their students or employees gain access to contraception. Well, now that Notre Dame has given its notice and the position is, at least with the government, they need not ever do it again, why is it that a preliminary injunction could speak to their not being required to do that in the future but the services continue to flow from either Acme or Maritime? In other words, I understand the case. Notre Dame wants to remove itself from the process. Right. It obviously isn't interrupting the services because, as Judge Bosner has indicated, it pretty freely advertises the route to which students and employees can get it. One might argue that's a detour that's not necessary. But I'm not quite sure what it is that would preclude an injunction which would honor their involvement, minimal though you think it is, from the process. My understanding is they want to remove themselves from having to remove themselves. Exactly. And that is, as this court said earlier, sort of paradoxical. How is the government supposed to operate a system like this one or like the draft system, for example, without asking those who want to step aside to inform the government of the wish to step aside? So you would say they'd have to revisit the legislation the way they did in their decision to exempt religious organizations. That would be the answer for Notre Dame, right? For Notre Dame. You would say they should lobby the national legislature to place them under an umbrella along with perhaps other civilly situated so they would be the equivalent of the archdiocese of New York or Chicago. That's right. What they are asking for, and I think they were quite explicit about that in their brief, is to be treated no differently than churches, which would result... Well, I think they analogize it because of the faith aspect of it. I don't think they're suggesting that they're ministering to individual Catholics the same way that the formal church is. No, that's correct. They're not saying they're exactly like churches, but they are saying they would like to be treated like churches have been treated under this regulatory scheme. Why do you think the churches were given that exemption? What is the government thinking in exempting churches? Well, the federal registers, not the particular portion, but those sets of pages do talk about this, and they talk about how it's a reasonable assumption that churches employ like-minded co-religionists. And that, of course, is in sharp contrast to Notre Dame, which has thousands of students and does not require any of them to be Catholic, and likewise with their employees. That is not a requirement. No, I understand. Okay, thank you, Ms. Kahn. So, Mr. Kass, your time has expired, but you can have some more time, if you'd like. Thank you. Just a few points. You know, the real problem, people keep saying Notre Dame, by sending that self-certification, opted out. It's just not the case. It couldn't be further from the case, and that's what Notre Dame has articulated. And importantly, although the certification has already gone into mail, the regulation itself requires two things, and I'll read from it. It says that if a third party administrator receives a copy of the self-certification, that already happened, and enters into and remains in a contractual relationship, then it provides the services at no cost. So, though the self-certification is out, there is this continuing relationship that violates Notre Dame's belief. Well, let's just take Maritime, for example. So you're definitely in a contractual relationship with the TPA there, right? We are, and that TPA can't provide those services unless it's in that contractual relationship with us, which violates our contract. So you want to break your contract with Maritime? No, if we were given the exemption, then the services, then the third party administrator would not be providing the services. All they do is administer our existing plan. But you would be modifying your contract with them? We would not be modifying our contract. We have a contract with them to administer our plan, and it is the plan that is subject to the mandate. If Notre Dame was exempted, the plan would not be subject to the mandate, and the third party administrator would not be providing the services. So that is the objectionable relationship. Judge Flom, you asked... What about the relationship with Aetna? It's the same thing. With Aetna, if we are not in a contractual relationship, we are fine. We can drop a student plan and not incur fines, but it is part of our religious exercise and makes us at a competitive advantage to offer that plan, which was recognized in Hobby Lobby as valid. If we did not do that, we would be coerced into violating our religious beliefs. So what relationship would remain between you and Aetna? Between Notre Dame and Aetna? We would... Again, if we were subject to the exemption, Aetna would not have to provide services under the mandate. We would be exempt. It wouldn't change the contract, but it would change the moral implications of the contract. The contract doesn't say anything about the specific drugs, the types of drugs that Aetna reimburses the students for? The Aetna plan is sent to the student, right? It's an insurance plan that is offered by Aetna to the student. It is not a plan between Notre Dame and Aetna. So what would happen on the ground? Let's say you were exempted, hypothetically. What will happen to students at ND with regard to these services? Well, my hope, at least according to the government and the students, is the same as was noted in Wheaton. To the extent that Notre Dame was exempt under the mandate, nothing would stop the government from redressing all of those harms, accomplishing all of those interests that it says it has by offering whatever it wishes to offer to the students without Notre Dame's involvement. Every single harm that's identified here can be redressed by the government. Aetna is the big provider of this nationwide, is it not? I mean, you aren't unique. The university here is not unique in dealing with Aetna. I don't know what insurance companies are used at other universities. You don't know anything about Aetna, do you? With respect to other universities? So your suggestion is that the government then, if you were exempted out, would have to speak independently to Aetna, and though you would still have your relationship with Aetna, are you going to have an objection to the government funding services to the very students that we speak of at any point? As the Hobby Lobby court noted and as the Corte court noted, the government has a number of alternatives available to it. It could modify the exchanges and the opinion in Hobby Lobby said that specifically, that nothing in RFRA... What happens then when taxpayers say, this is a substantial burden on my religious beliefs to require me to pay taxes to cover that program? Hobby Lobby talked about that example explicitly and said that our courts have already determined that under strict scrutiny that doesn't gel and so the religious... Why is that a principled line that anybody of true religious faith should accept?  No, as to whether it's a burden. Because Hobby Lobby lays out the test. Because the Supreme Court said so. The Supreme Court said, and I think that answers the question of why are we here, is this court's decision didn't go to strict scrutiny at all so it can't be about developing a different record on strict scrutiny because the GVR standard is that there is at least likelihood that the court would reconsider its decision based on a premise in the original decision. And the only premise in this court's original decision is that there was no substantial burden because the accommodation washed Notre Dame's hands of participating and permitted it to opt out. And Hobby Lobby says the only test is simply asking the believer, does your act cause you to violate your religious beliefs? And the substantial part is, is there substantial pressure? In Hobby Lobby there were fines and they're the exact same fines here. So what makes Hobby Lobby so important, it was only about one thing. It was about substantial burden because that's what this court's decision was about. It didn't talk about seamlessness. It didn't talk about any of these things. It only said Notre Dame's not burdened. That's it. So you said a second ago that the plan under which the contraceptives are provided is between Aetna and the students. No. That is what you said. I said that with respect to the student plan, with respect to the employee plan. Oh yeah, well let's talk about the student plan. The plan is between the Aetna and the students. Notre Dame is not a party. So what is the problem for Notre Dame's religious beliefs that there is this plan to which it is not a party? Because Notre Dame offers that insurance. I don't understand how it can be offering the insurance if the plan is between Aetna and the students and we know that Notre Dame by its opt-out doesn't have to pay for any of this contraception. So what is Notre Dame's business with this plan? I guess you can view it in terms of brokering, Your Honor. Notre Dame makes the plan available to its students. Students who are on that Notre Dame plan funnel through the Notre Dame health center. Notre Dame tends to them on campus as part of their infrastructure, directs them where to go. What, you mean it gives them a phone number? No, when a student on the Notre Dame student plan gets a cold, they don't go out into South Bend and go find a cold doctor and then submit an insurance form. It is through the Notre Dame relationship and through the Notre Dame health center they are told where to go, they are counseled. You mean they order contraceptives through Notre Dame health services? No. As far as contraceptives is concerned, Notre Dame is not involved. Notre Dame believes that it is. It is not involved. It is not part of the transaction. The students don't go to a health counselor in Notre Dame and say, I want a contraceptive. Could you put me in touch with Aetna? The factual reality... Is that correct? Am I correct? I'm trying to answer it, your honor. Well, I'm asking, am I correct? That's a yes or no. Those students have to go to Notre Dame and ask the question. And they do. Those students go to Notre Dame and ask the question. And they do on a day to day basis. No, they call the phone number. That's what the enrollment guide tells them to do. Right. And the problem with how this mandate operates in reality is that you have a bunch of students on Notre Dame campus that turn to that school and its administrators on a day to day basis. This isn't in the record, of course.  Wouldn't it be nice to have a record? But I don't necessarily believe you, right? You don't know. You're guessing. So wouldn't it be good to have a record in the district court about the actual relationship between Notre Dame and provision of contraception to its students? It wouldn't change the fact that... It would change the fact if, in fact, nobody employed by Notre Dame has anything has any contact with students who are seeking contraceptive coverage. Wouldn't that affect the case? It wouldn't affect their moral determination that their relationship with that... But they wouldn't have a relationship. Maybe not for you, Your Honor, but for their concept of scandal... Suppose a student at Notre Dame decides she wants contraception coverage. She looks on the web and she understands that Aetna insures contraception. It's on its website. So she calls up Aetna and says, I'd like this insurance. Now, would the fact that she was a student at Notre Dame make Notre Dame complicit in her contract with Aetna? Yes, it would. Because, in the first instance, that contract with Aetna was made possible by Notre Dame's relationship with Aetna in negotiating... Okay, let's take Aetna out of it. Let's have another health insurer. Metropolitan Life or something. So the student calls up Metropolitan Life instead of Aetna. Does that also make Notre Dame complicit in sin? If I understand your hypothetical correctly, it is that a student reaches out to an insurer not affiliated or in a relationship with Notre Dame and enters into a contract pursuant to which it obtains contraceptive coverage without Notre Dame's involvement. That is a religious determination. My sense, I think it's ultimately up to Notre Dame to answer that question, my sense is that would not be a problem. That removes the contractual relationship problem. And if Notre Dame is not a part of it, and it is not an entity with which Notre Dame does business or has a relationship, and that student enters it into its own separate third-party relationship with an insurer, my sense is, although it's Notre Dame's call, that does not raise the moral problem. Let's say substantial burden exists and an exemption is appropriate. What would be your relationship tomorrow with Aetna? Suppose Aetna, just in my hypothetical, also as a general matter provides these services to many campuses, so it's not tailored, they just have a campus policy. I may be way off base on that, but let's assume that for a second. Would you not deal with Aetna because it's involved in providing those services? That is not a religious exercise we have articulated. We're not suggesting that Notre Dame wants to boycott every organization that provides contraceptives to somebody in California. Is there any reason you could not under RFRA? Is there a reason that Notre Dame could not articulate that religious exercise if it believed it? You could choose that policy, sure. If it had a sincere religious belief in that, which it does not, but if somebody else had a sincere religious belief in that, they certainly could articulate that, and then you would go to the strict scrutiny analysis. I just want to be clear on this. A substantial burden is recognized and an exemption is appropriate. Would it be the university's position that it would only maintain a broker relationship or whatever the appropriate description should be for the health plan for the students with a provider that does not in any event offer those services? To whom? To the students. Right. Notre Dame has articulated that it has a religious objection to entering into a contract with a company that provides the objectionable services to its students. Right. Which you have now, right? Correct. That's where we are. So the university would be about finding a provider that does not do that. Right, but if Notre Dame was given the benefit of the exemption, the mandate would apply and Aetna would not be providing those services to its students pursuant to those contracts. And more importantly, not to its employees. Yeah, but the mandate, you're saying that if you had the exemption, it would cause the mandate not to affect the carrier Aetna and the insurance carrier? The mandate applies to the plan. So for the self-insured plan, it would be Notre Dame's plan and Meriting wouldn't be administering those services. For the insured plan, it would apply to the plan and Aetna wouldn't be offering those services. Thank you, Scott. I'm still puzzled about whether Aetna should be a party. Sometimes you suggest that you want to break or alter your contract because you talk about this objectionable contractual relationship. But at least one other point, you suggested that the provision of the services by Aetna is not really part of the contract. That Aetna decides what to provide and you don't control that. I don't understand that. Doesn't Notre Dame negotiate with Aetna as to what types of medical care Aetna will ensure? Yes. Notre Dame negotiates with Aetna and for years has negotiated offering an insurance plan that did not include contraceptives. That does not? Correct. But then, of course, they were forced to change. Now, what if Aetna likes this new deal? It likes providing this contraceptive coverage. Maybe it's a lucrative form of insurance. Then if you don't want them to do that anymore, aren't you asking to modify the contract? No. See, that's what I don't understand. They have a contractual obligation to provide this contraceptive stuff, right? They have an obligation under the mandate to provide it as long as they are in a contractual relationship with Notre Dame. I know, but that doesn't imply unilateral authority to rescind the contract. I mean, obviously, your contractual duties are coterminous with the contract, but that doesn't mean that the other party can say, oh, contract is over. I don't need you anymore. If it has a term, it has provisions about cancellation and maybe compensation, something of that sort, doesn't that have to be honored? But the contractual relationship both with Maritain as an administrator and any relationship with Aetna as an insurer has always been one that does not include those services, including now. But while in that contractual relationship, the government adds on to that relationship the objectionable services, changing the moral consequences of the contract. And when the moral consequences change, Notre Dame would want to... No, my problem is to terminate a contract with someone who is not a party to the case in which you're asking that the contract be terminated. That's very irregular. Your Honor, we're not asking this court to terminate any contract. Your Honor, because a piece of the contract is that... Now, it's true that it was forced on you by the government, although Reverend Jenkins may not have agreed at one point, but the government has forced your contract when you signed the exemption form. It forced you, and you have been dealing with Aetna, and Aetna has been providing these contraceptives. Now, maybe that's a lucrative business for Aetna. It loves it. Wouldn't you have to deal with Aetna if you wanted to suddenly take away part of their business? No. The contract has not changed as a result of the mandate. I don't understand. Of course a contract can be changed by an external force. If the government says your contractual obligation now includes contraceptive coverage,  that is now an obligation of Aetna. That's not what the mandate says. Your obligation under the mandate, under this regulation, is to provide the services. The government didn't go in and add riders to existing contracts all around the country. Contracts are the same. It is the mandate that requires these parties to provide services that can only be provided because of and for the duration of and when in a contractual relationship with Notre Dame. That has changed the moral consequences. So if the exemption was offered, the services wouldn't provide. The contract, though, would say the same thing tomorrow as it said a month ago as it did in December when we first came before the district court. Contracts haven't changed. So your contract with Aetna does not mention contraceptive coverage? No. Well, it doesn't include it. Does it mention it? No, nor with Maritime. There is no, you're going to process contraceptive... It's actually to the contrary. I mean, there are circumstances where contraceptives are offered for health reasons and those are covered. So to the extent contraceptives are mentioned, yes. But those contracts have always excluded that coverage and the government pursuant to the mandate didn't mail out riders to be stapled to the end of every contract. Didn't they do that in effect by the mandate? Well, they changed the moral consequences by the mandate of that contractual relationship. And again, all of that would disappear if Notre Dame were granted the exemption that churches are exempted. And Hobby Lobby noted that where the government offers this exemption and says we're doing it to respect your religious liberty, they must recognize that not offering that is some type of burden or they just would have said to the churches, hey, we've got this great accommodation, it's an opt-out. Hobby Lobby was content with the exemption. Yes, Hobby Lobby did not. Well, I don't think that's really established in the record but in the opinion in Hobby Lobby, the court said that Hobby Lobby had not articulated an objection to the accommodation. Notre Dame does. And it's entitled to under Hobby Lobby. That's the whole point. It's up to the believer to state his religious exercise. And it was the same argument that the government was making. Hobby Lobby, you've been washed from contraception abuse because it's third parties that are doing this. And that's what the government says today. Notre Dame, you've been washed from this because we're going to go make third parties do that. And Hobby Lobby said that's the wrong question. And that's the wrong analysis. All that matters in substantial burden analysis is the degree of coercion. And here it is the fines. And it's up to... We can say hypotheticals, would you object here and would you object here. The problem with the moral analysis is when courts or anyone starts saying, well if you would accept this then you must be able to accept the accommodation because I see a logical connection and they're the same. But that's not what faith is about. The kosher diet, Jewish theologians state affirmatively that there is no logical basis to the rules of the kosher diet. And so if you say, well it's okay to eat a fish with scales and here's a young swordfish that has scales you must be able to eat it, the answer is no they can't. Because an older swordfish might lose its scales. We can't go into saying, well if you can eat that you must be able to eat this. It's up to the Jew to say I'm telling you what the rules are, this is my religious belief and there's nobody that can second guess this. And the real question is why is the government here? The government's here because they need Notre Dame to act or they wouldn't be here. And Notre Dame says the act that it's taking violates its belief. You admit they need Notre Dame to act you weaken your case because then it becomes a question of balancing the governmental interest in providing contraception free of charge and Notre Dame's religious interests. Well that's right, and that may be part of the strict scrutiny analysis but with respect to burden the government by being here has to concede that Notre Dame has to take acts to make this scheme work. Well that's like paying taxes, right? Yes. And the religious people do have to pay taxes. They do. Well this is a kind of tax, isn't it? Notre Dame is being asked to contribute to a governmental program of facilitating contraceptive coverage for which the government has articulated substantial reasons. Wouldn't it, this goes back to Judge Plum's question, wouldn't it be valuable to have a trial at which these different interests were evaluated? If Corte didn't already decide the strict scrutiny question in this circuit and the reference was made to the D.C. circuit based on Jilardi, Jilardi was vacated by Hobby Lobby, Corte was not, Corte is still good law. You don't need that evidence on the substantial burden issue because there's no facts in dispute. The Hobby Lobby test is, did they articulate a religious exercise? There's another side of it, there's the balancing, it's a balancing test. And there is a substantial interest having to do with women's health and wanted and unwanted children, all sorts of other, and of course abortion. The less contraception you have the more abortion you get. So there are these considerations which argue for the provision of this free and balanced against the complicity in sin belief of Notre Dame which doesn't seem to be a general Catholic doctrine. The only balancing in RFRA is the strict scrutiny analysis. With respect to substantial burden there's not a balancing test. I don't understand you. The RFRA statute. I mean if we talk about taxes you say religious people have to pay taxes. So isn't that a matter of balancing religious economy against governmental interest? Right. Why is this, this is less clear cut obviously, but why isn't this the same type of analysis? You balance the government interest against the religious autonomy interest. Hobby Lobby spoke to that balancing test specifically and said that that balancing test is part of the strict scrutiny analysis. Footnote 37. What is the strict scrutiny analysis? The strict scrutiny analysis is if there is a substantial burden, and I think Hobby Lobby demonstrates that in this case there is, you then identify whether there's a compelling interest, which the government has been talking about, but here it's a compelling interest as to this specific plaintiff. Not a compelling interest in contraceptive and women's health in general, but only the compelling interest articulated with respect to employees at Notre Dame and students at Notre Dame. That's fine. And then you identify that interest, determine whether it's compelling, and the Hobby Lobby court certainly cast, it assumed compelling interest for the purposes of the opinion, but didn't decide it. And it noted when making that assumption that all of the millions, 90 million Americans that don't get seamless coverage because they're not subject to the mandate, whether they're employees of churches or whether they're small employees or whether they've been grandfathered, undercuts compelling interest. But if the court, if the interest, not in free contraception, because the government can give free contraception however it wants, but free contraceptives in such a way that it's seamless with Notre Dame's health care offerings for Notre Dame's employees, if they can demonstrate that, then they go to whether the way that they have chosen to do it is the least restrictive means. That is, there is no other way to accomplish providing free contraceptives to Notre Dame's employees and students in the way that accomplishes those interests. What they're going to say, I assume, is that the efficient way to do it is use the existing insurers as the vehicle for the provision of the government money. The government doesn't get to prove, and again, the strict scrutiny test is the most demanding test in constitutional law. It doesn't get to prove that by saying this is what makes it most convenient. That would fail miserably. What it needs to say is there is no other way of doing it. I don't agree with you because the balance on the other, the interest you assert is weak because it's not, this is not Catholic doctrine. This is some Notre Dame thing. Well, that's a pretty dangerous determination to make from the court as to whether Notre Dame's religious exercise is weak. What about the religious schools that are going along with this mandate? Aren't they to be considered? You don't determine the sincerity of Notre Dame's religious belief. It's not a matter of sincerity. It's a matter of how important it is relative to the government interest. Oh, but nothing could be clearer in constitutional law that the courts are never to determine any exercise, any religious exercise, not only ones that are central to the faith, not only ones that are important, whether it's a Jew not flipping the switch on a Saturday, the court is never in a position to determine, I think the flip-switching really isn't all that important or is weak. It's only for the believer to say their religious exercise and they all must be respected. And if the courts start determining which religious beliefs are weak or which religious beliefs are strong, then that takes away the whole point of RFRA, which was to respect any religious exercise. Well, I don't think you'd say that about the religious beliefs of ISIS. Mr. Karras, can I, with the permission of Presiding Judge, Mr. Karras, considering that dialogue you had with Judge Bozer about taxes, don't you believe that, or is it your position, that if there were a hearing, and I understand about the flip-the-switch analogy and all that, that a hearing on the balancing of the depth of this particular aspect of Catholic faith as against the government's interest, and let's assume a compelling interest for the sake of this, wouldn't that come into sharper focus if it wasn't just an exchange between counsel and judges? I'm not questioning in any way, as you might suspect, the depth of the faith. I'm just saying that these are bumping up against each other. You know, we're struggling to respect and at the same time understand governmental interests. Wouldn't you think it'd be in sharper focus if that played out in a hearing? I think it would with respect to the strict scrutiny analysis, but with respect to whether there's a religious exercise here and whether... Well, let's assume there is a religious exercise, that it may involve, very well involve, a substantial burden, and then we have to move on to recognizing that, let's say, and honoring that, how we're going to accommodate this governmental interest, which not only bumps up, but let's say clashes with a deeply held religious belief. How are we to do that without some understanding of how they're going to execute this compelling interest? Assuming Your Honor's question, as I understand it, is that there would not be any use for additional facts or anything other than colloquy of counsel on the substantial burden part. I would think not. I wouldn't preclude it. I mean, if those who would question, apart from sincerity, the centrality of this particular aspect of Catholic doctrine, as a district judge, I wouldn't preclude that being heard. Right. I think Hobby Lobby suggested that a court would preclude that kind of debate as to what's central and what's not. That's my point, is with respect to centrality, the religious burden part of the RFRA analysis, I think that you do need to preclude evidence about that. The only evidence that's relevant is Notre Dame's articulation of its religious exercise and that the acts violate its religious belief. You can have development of a record on sincerity. That's open for the court as to whether you really believe that or not, and certainly the Jane Doe has brought that into question. It was never contested by the government. But the rest of it's not open to facts. Strict scrutiny absolutely is. You're right. Development of a record  in the abstract would benefit from a record. The problem is, it's the government's burden, and the government has offered nothing on it. And so with respect to this preliminary injunction, and particularly in light of Corday that's still good law, that issue's over. And so the injunction needs to be issued. But you're right, with respect to the ultimate development of the merits, that may change. Have you read our decision in  A couple years old. I have not, Eric. Well, Patricia Fuller was a religious sister. I'm sorry, I have read this piece. And she had a... She claimed to have an apparition of the Virgin Mary. And she created a devotion for the Virgin Mary. And she had a website and a statue and things like that. And a Catholic lawyer, layman, layman Catholic lawyer, McCarthy, sued her saying that this was not a legitimate devotion. And that she, by the way, was a fake nun. So she sued him for defamation and other torts. And the district judge said, well, he says she's a fake nun. She's naturally a religious sister, not a nun, but close enough. And he said, and she says she's legit. And I'm going to let the jury decide what she is. And we said, no, you can't do that. This is a religious issue. And since this is a Catholic controversy, we will ask the Vatican to inform us what her status is. And we wrote the Congregation for the Doctrine of the Faith and they submitted an amicus curiae brief and they said she is not a religious sister. And we said that is that. No court can re-examine this determination. Might it be useful in a case like this to see what the Congregation for the Doctrine of the Faith believes about the complicity with mortal sin where you have disagreement among distinguished Catholic religious organizations? Would that be appropriate or would you consider that not a proper thing for a court to do? Well, we cited McCarthy, to your honor, and I know your honor turned to the Vatican for an answer on whether or not she was a nun, which strikes me as kind of a factual issue, not a religious issue. It's a hierarchical issue. Is she a nun or is she not? And maybe the Vatican, and I think in fact the Vatican has something to say about that. Here we are talking about Notre Dame's articulation of its religious beliefs. I suppose if you wanted to get into Catholic hierarchy, each diocese is empowered to set decisions and policies for its own diocese. This isn't an issue where the Pope directs to the cardinals who direct to the bishops who direct to the priests and there is one unified issue. Rather, priests and bishops and theologians and cardinals throughout the world are constantly trying to develop answers to moral questions Occasionally, and extraordinarily rarely, the Pope will issue a statement under infallibility in which he speaks on behalf of the entire Catholic Church, but that's not how Catholic faith operates. All of this, I think, is beside the point because unlike in McCarthy, which dealt truly with hierarchy, this deals with religious beliefs and all of the jurisprudence in the United States on these issues has always said that it's up to the particular plaintiff in that case to articulate what his religious beliefs were and every time someone articulated a religious belief that the courts instead would say I'd like to talk to your pastor, I'd like to talk to your rabbi and you know what, I don't believe your rabbi, I want to talk to the guy who's his boss and we need one grandmaster of each religion to speak on issues of religious faith. That's just not how it works and I think the courts are precluded from doing that. Rather, what we've got is a believer is entitled to articulate what his belief is and RFRA says respect that. Well, the university is run by an order, right? Right, the Holy Cross. So, is it fair to say that this is Holy Cross's position? Well, it's Notre Dame's position. I mean, Notre Dame's president is a Holy Cross priest, but it still is an organization with a board of fellows and a board of trustees and its mission is to act in accordance with Catholic principles. When you personalize it as a part of the corporate entity, it actually helps, I think, your argument as to the depth of the state. Okay, well thank you very much, Mr. Carries, and we thank your opponents as well and we'll take the case under advisement. Thank you.